**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| GEORGE SOFTLY, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED,[1]<br><br>PLAINTIFFS,[1]<br><br>V.<br><br>AMERICAN HONDA MOTOR CO., INC. AND JOHN DOES 1-10,<br><br>DEFENDANTS. | CIVIL ACTION NO. 1:21-CV-13314-RMB-AMD |

**SECOND AMENDED COMPLAINT**

---

**LEWIS G. ADLER, ATTORNEY AT LAW**
Lewis G. Adler - Attorney ID#:  023211985
26 Newton Ave., Woodbury, NJ 08096
Tel. #: 856-845-1968; Fax #: 856-848-9504
Email:  lewisadler@verizon.net
Counsel for plaintiffs

**PERLMAN-DEPETRIS CONSUMER LAW**
Paul DePetris - Attorney ID#: 005821996
Email: info@newjerseylemons.com
Lee M. Perlman - Attorney ID#: 019171994
Email: lperlman@newjerseylemons.com
1926 Greentree Road, Suite 100, Cherry Hill, New Jersey 08003
Tel.#: 856-975-9779; Fax#: 888-635-5933
Counsel for plaintiffs

**THE ROBISON LEMON LAW GROUP, LLC**
Emma C. Robison - Attorney ID#: 029452011
181 Andrien Rd., Glen Mills, PA 19342
Tel.#: 267-504-4744; Fax#: 267-504-4783
Email: emma@lemonlawcar.com
Counsel for plaintiffs

---

[1] For simplicity's sake all references to the parties named to this case shall use plural rather than singular designation, regardless of their actual number.

Plaintiffs plead as follows:

## ABBREVIATIONS USED IN THIS DOCUMENT

i.  For brevity's sake, hereafter the following abbreviated
    terms are used in this document:

A. This civil action - this case or the case.

B. Plaintiffs George Softly - plaintiffs.

C. Defendants American Honda Motor Co., Inc. - the
   manufacturer or defendants or Honda.

D. John Does 1-10 - fictitious defendants named to the
   complaint - the Does.

E. All parties named to the complaint collectively - the
   parties.

F. The 2018 Honda Odyssey that is the subject of this
   case - the vehicle.

G. The sales or lease transaction that is the subject of
   this case - the sale or the transaction.

H. Burns Honda, 325 North Route 73, Suite A, Marlton, New
   Jersey 08053 - the selling dealer.

I. The contract for the sale or lease of the vehicle to
   plaintiffs - the contract.

J. The various new vehicle limited warranties that
   defendants issued plaintiffs with the vehicle
   collectively - the warranty.

K. The automotive repair attempts that defendants'

authorized dealerships performed to the vehicle under the vehicle's warranty - the repairs or repair attempts.

L. The automotive dealerships that performed the repair attempts collectively - the servicing dealers or the dealers.

M. The problems-nonconformities that the consumers' experienced with the vehicle and/or when using the vehicle - the problems or the defect.

N. The New Jersey Truth-In-Consumer Contract, Warranty And Notice Act, N.J.S.A. 56:12-14 To -18 - TCCWNA.

O. New Jersey Uniform Commercial Code, N.J.S.A. 12A:1-101, et seq. - UCC.

P. Magnuson-Moss Warranty- Federal Trade Improvement Act, 15 U.S.C. § 2301, et seq. - MMWA.

Q. The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, Et Seq. - CFA.

R. New Jersey Used Car Lemon Law, N.J.S.A. 56:8-67, et seq. - UCLL.

S. N.J.S.A. 56:8-2 - section 2.

T. New Jersey Division Of Consumer Affairs - DCA.

U. An act concerning new motor vehicle warranties and repealing P.L. 1983, c. 215 and making an appropriation, N.J.S.A. 56:12-29, et seq. a-k-a the

New Jersey New Car Lemon Law – NCLL.

V. New Jersey Automotive Sales Practices Regulations, N.J.A.C. 13:45A-26B.1, et seq. – ASP.

W. New Jersey Automotive Advertising Practices Regulations a-k-a New Jersey Motor Vehicle Advertising Practices, N.J.A.C. 13:45A-26A.1, et seq. – MVAP.

X. Motor Vehicle Cost Information Act, 49 U.S.C. § 32701, et seq. a-k-a federal odometer law – FOL.

Y. An Act Concerning Service Contracts And Supplementing And Amending P.L.1980, C.125; the Service Contracts Act, N.J.S.A. 56:12-87, et seq. – SCA.

Z. National Highway Transportation Authority – NHTSA.

**EXHIBITS TO COMPLAINT**

1. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

2. Attached hereto as complaint Exhibit A are repair invoices for the vehicle and defendants' warranty claims summary for the vehicle reflecting repair attempts to the vehicle.

3. Attached hereto as complaint Exhibit B is the article titled The Warranty Process Flow Within The Automotive Industry:  An Investigation Of Automotive Warranty Processes And Issues (Center For Automotive Research, August 2005).

4. Attached hereto as complaint Exhibit C is a chronology.

5. Attached hereto as complaint Exhibit D is a safety recall job aid for the vehicle.

6. Attached hereto as complaint Exhibit E is an interactive network message from Brad Ortloff, Manager of Auto Campaigns and Recalls dated 11-10-18.

7. Attached hereto as complaint Exhibit F is an interactive network message dated 12-20-18.

8. Attached hereto as complaint Exhibit G is a certificate of origin for the vehicle.

9. Attached hereto as complaint Exhibit H is the expert report of Richard Roth of RSJ Auto LLC and a document titled "2018 Honda Odyssey Prices and Values Wagon 5D EX-L DVD Nav".

10. Attached hereto as complaint Exhibit I are two different versions of Repair order number 36134730.

11. Attached hereto as complaint Exhibit J are a series of posts on an online vehicle forum called ODY CLUB.

12. Attached hereto as complaint Exhibit K is a privilege log produced by defendants in discovery.

13. Attached hereto as complaint Exhibit L is an email exchange between Staci Softly and John McKeen.

14. Attached hereto as complaint Exhibit M is a letter from plaintiffs' counsel to defendants.

## PARTIES

15. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

16. Plaintiffs are individuals with an address of 109 South Lenola Road, Moorestown, Burlington County, New Jersey 08057.

17. Defendants American Honda Motor Co., Inc. is a business with address of 1919 Torrance Boulevard, Mail Stop 100-5E-BA, Torrance, California 90501-2746.

18. John Does 1-10 are fictitious entities and-or individuals, including but not limited to those who have yet to be identified by plaintiffs but whose identity may be revealed during the period of discovery that shall occur in future relative to this action and who may be liable for plaintiffs' damages as referenced herein or who are known but not presently considered to be indispensable parties relative to this matter.  Such individuals/entities may include but are not necessarily limited to automotive manufacturers, automotive distributors, automotive parts manufacturers, automotive parts distributors, automotive transporters, automotive dealerships, contractors, subcontractors, independent contractors, companies, corporations, businesses, partnerships, agents, officers, directors, managing members, employees, salespeople,

technicians, staff, workmen or representatives of the other

defendants named herein.

## FACTUAL ALLEGATIONS

19. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

20. This case is a putative class action against the manufacturer of a vehicle that knew that the vehicle suffered from defects long before plaintiffs purchased the vehicle.

21. The defect involves the sliding doors of a passenger minivan named after a Homeric epic poem – i.e., the Honda Odyssey.

22. The vehicle is one of a line of identical or substantially similar (depending on the trim package) of class vehicles suffering from the same defect.

23. The vehicle is equipped with electrically operated sliding doors that have a very dangerous defect, as the doors fail to operate properly.

24. What resulted following the sale of the vehicle to plaintiffs was a chain of repair attempts and a vehicle that suffers from a diminution in value due to those repair attempts.

25. Defendants, via their warranty reimbursement department, were clearly aware of the defects but refused to put safety above profits by halting the sale of class vehicles and altering prospective purchasers such as plaintiffs to the

defects.

26. Despite that foreknowledge, the manufacturer failed to disclose the existence of that defect to plaintiffs before plaintiffs purchased the vehicle from the manufacturer's franchise dealership – the selling dealer.

27. What resulted was a chain of repair attempts and a vehicle that suffers from a diminution in value due to those repair attempts.

28. At all times relevant to this case, the selling dealer was a dealership authorized by defendants to sell the vehicle, issue manufacturer warranties associated therewith, service the vehicle and perform warranty repairs to the vehicle under the warranty.

29. At all times relevant to this case, the selling dealer was a "dealer", meaning a person who is actively engaged in the business of buying, selling or exchanging motor vehicles at retail and who has an established place of business.[2]

30. At all times relevant to this case, the vehicle was a "motor vehicle", meaning a passenger automobile, authorized emergency vehicle, or motorcycle as defined in N.J.S.A. 39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the New Jersey Motor

_____

[2] N.J.S.A. 56:12-30; N.J.S.A. 56:12-31

Vehicle Commission, except the living facilities of motor homes. [3]

31. At all times relevant to this case, the vehicle was a "consumer product", which means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).[4]

32. Defendants manufactured and-or assembled and-or distributed and-or advertised the vehicle, prepared the warranty and via the selling dealer, issued plaintiffs the warranty.

33. At all times relevant to this case, the manufacturer was a "manufacturer", meaning a person engaged in the business of manufacturing, assembling or distributing motor vehicles, who will, under normal business conditions during the year, manufacture, assemble or distribute to dealers at least 10 new motor vehicles. [5]

34. At all times relevant to this case, the manufacturer was a "supplier", which means any person engaged in the business of making a consumer product directly or indirectly

---

[3] N.J.S.A. 56:12-30.
[4] 15 U.S.C. § 2301(1).
[5] N.J.S.A. 56:12-30.

available to consumers.[6]

35. At all times relevant to this case, the manufacturer was a "warrantor", which means any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty.[7]

36. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer or lessee, other than for purposes of resale or sublease, of a motor vehicle; a person to whom a motor vehicle is transferred during the duration of a warranty applicable to the motor vehicle; or any other person entitled by the terms of the warranty to enforce the obligations of the warranty.[8]

37. At all times relevant to this case, plaintiffs were "consumers", meaning a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any new other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of

---

[6] 15 U.S.C. § 2301(4).
[7] 15 U.S.C. § 2301(5).
[8] N.J.S.A. 56:12-30.

the warranty (or service contract).[9]

38. Pursuant to its definition of "motor vehicle," the NCLL applies to the vehicle and the class vehicles: "Motor vehicle" means a passenger automobile or motorcycle as defined in R.S.39:1-1 which is purchased or leased in the State of New Jersey or which is registered by the Division of Motor Vehicles in the Department of Law and Public Safety, except the living facilities of motor homes." N.J.S.A. 56:12-30.  Pursuant to said definition, the New Jersey motor vehicle code, N.J.S.A. 39:1-1, et seq., defines "motor vehicle" as follows:  "Motor vehicle" includes all vehicles propelled otherwise than by muscular power, excepting such vehicles as run only upon rails or tracks and motorized bicycles."  N.J.S.A. 39:1-1.

39. Plaintiffs are "purchasers" as defined by N.J.S.A. 56:12-30 and the manufacturer is a "Manufacturer" as defined by N.J.S.A. 56:12-30.

40. The dealers were the manufacturer's "dealers" as defined by N.J.S.A. 56:12-30 and as referenced in N.J.S.A. 56:12-31.

41. Here is a chronology of events occurring before the sale which is partially taken from a chronology found upon information and belief on the NHTSA website.

---

[9] 15 U.S.C. § 2301(3).

42. From May to July 2017 - Honda received a report of a power sliding door not fully closing.

43. Accordingly, Honda launched an investigation and analyzed the returned failed parts from the affected vehicle.

44. However, Honda claimed that Honda was unable to duplicate the claimed symptoms.

45. In August 2017, Honda continued its investigation and conducted a dealer visit.

46. Working with the supplier of the power sliding door's rear latch assembly, Honda was able to re-create the unlatched power sliding door symptom. Honda and the supplier suspected that the gears and levers that actuate the rear latch were sticking and preventing proper latching to the door strikers.

47. In September 2017, Honda conducted another dealer visit after receiving a claim that a power sliding door opened while the vehicle was underway. Honda confirmed that the affected vehicle's front and rear latches in the power sliding door would not latch.

48. In October 2017, after studying the suspect parts from the affected vehicles, the supplier focused on improving the application of grease to the rear latch assembly.

49. In February 2018, while improved grease application procedures appeared to substantially reduce claims of

improperly latched rear sliding power doors, because grease application could vary and thus affect production quality, the rear latch design specifications were enhanced to minimize the potential for gears and levers to become stuck.

50. In April 16, 2018, as a quality improvement effort, the redesigned rear latch assembly was applied to mass production.

51. In May to June 2018, after conducting a survey of vehicle owners, Honda learned that in some circumstances a vehicle could begin moving with an open power sliding door without the driver being notified via an audible warning (chime), as was intended.

52. After confirming this failure mode, Honda reviewed warranty claim data to see if the claim data reflected the survey results.

53. The data showed that Honda received related warranty claims after initiation of the improved grease application process in October 2017.

54. Honda thereupon began to reexamine the cause of sticky door latches.

55. On March 3, 2018, the vehicle that is the subject of this case was transferred from Honda to the vehicle's selling dealer – one of its franchise dealerships (Burns-Kull Inc.

d/b/a Burns Honda) located in Evesham Township (Marlton), Burlington County, New Jersey.  Exhibit G.

56. On March 23, 2018, the selling dealer performed a predelivery inspection of the vehicle.  Exhibit A.

57. On July 19, 2018, a person claiming to be a 2018 Honda Odyssey owner began what became a series of posts on an online vehicle forum called ODY CLUB about Honda Odyssey owners' problems with the sliding doors of their vehicle. Exhibit J.

58. These posts reveal that, at that time, the manufacturer clearly knew of the defect, since it was being reported to the manufacturer's franchise dealerships during the course of warranty repair attempts.  Exhibit J.

59. Between July to October 2018, following a renewed investigation with the rear latch assembly supplier, Honda's analysis of returned parts confirmed that factors beyond insufficient grease application could result in sticky power sliding door rear latch gears and levers.

60. On November 2, 2018, Honda determined that a defect related to motor vehicle safety exists and decided to conduct a safety recall.   Exhibit D.

61. As of November 2, 2018, Honda has received 3,814 warranty claims, 182 field reports, and no reports of crashes or injuries related to this issue.

62. On November 10, 2018, Brad Ortloff, Honda's Manager of Auto Campaigns and Recalls issued all Honda parts and service managers, advisors and personnel a written interactive network message titled "Stop Sale/Safety Recall: 2018-19 Odyssey Power Sliding Door Rear Latch". Exhibit E.

63. That message states: "On November 9, 2018, American Honda notified NHTSA of a safety recall and stop sale for certain model year 2018 and a small number of 2019 Odyssey vehicles due to concerns related to the rear passenger power sliding doors. **Refer to your Responsibility report or do an iN VIN status inquiry to determine which vehicles in your inventory are affected.** Failure to repair a vehicle as necessary prior to sale may subject your dealership to claims or lawsuits. **CONCERN** Due to a specification issue, the rear latch assemblies on the power sliding doors may Exhibit higher than normal friction causing the mechanism to stick. A stuck rear latch mechanism may restrict doors from fully closing, allowing the doors to open unexpectedly and increasing the risk of injury for occupants. **REPAIR** Replace the rear latch assembly for both the right and left sliding doors. If sufficient latch assembly repairs kits are not available at the time of a repair, the power sliding door function can be temporarily disabled and the doors can be used in manual mode. A detailed procedure is

available in the service bulletin and requires customer consent. This is a temporary procedure and the customer will still be required to bring their vehicle back to the dealership for final remedy repair once parts are available. **PARTS** Repair kits are available in limited quantities and will be auto shipped to all dealers as inventory arrives from the vendor. Internal part shipments are expected to arrive at dealers by November 10, 2018 through a daily stock order. Parts inventory is expected to stabilize before late-December 2018 and, until that time, regular auto shipments will be sent, as needed, up to twice per week to ensure continued part supply to dealers. An additional notification will be made when parts are available for open dealer ordering. **TOOLS** No special tools are required to complete either repair procedure. **SERVICE BULLETIN** Service bulletin 18-128, *Safety Recall: Sliding Door Rear Latches,* has been posted to the Service Information System. This bulletin includes parts, repair procedures, and warranty information related to this recall. **CUSTOMER NOTIFICATION** American Honda expects to complete initial customer notification for this recall by early January 2019. Please reference job aid *Safety Recall: Power Sliding Door Rear Latches - Frequently Asked Questions* for additional details on disabling the power

sliding door function As always, be sure to do an iN VIN status inquiry for all vehicles passing through your dealership to determine eligibility for any open campaigns. Exhibit E.

64. Between November 12, 2018 and November 15, 2018, the selling dealer performed a service campaign and/or safety recall on the vehicle's sliding door.  Exhibit A.

65. On or about December 12, 2018, plaintiffs purchased the vehicle in new condition with an odometer reading of approximately 438 miles from the selling dealer in Marlton, Burlington County, New Jersey.

66. Plaintiffs are the parent of children and purchased the vehicle as family transportation for use on roadways.

67. When plaintiffs purchased the vehicle, plaintiffs were totally unaware of the defect.

68. Plaintiffs' purchase of the vehicle occurred after defendants knew of the defect as reflected by documentation that defendants issued about the defect.

69. Before the sale, defendants never notified plaintiffs of the defect or the recall or the performance of the recall on the vehicle – something that never fixed the vehicle.

70. Upon information and belief, before plaintiffs purchased the vehicle from the dealers, none of the employees of the manufacturer ever forwarded plaintiffs any literature about

the defect.

71. Upon information and belief, before plaintiffs purchased the vehicle from the dealers, none of the employees of the dealership that showed plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever gave plaintiffs any literature mentioning or referring to the defect.

72. The parties already engaged in discovery when this case was venued in the Superior Court of New Jersey which included defendants providing answers to interrogatories and a response to a notice to produce but date, defendants never produced a single document indicating that, before the sale, defendants ever notified plaintiffs of the defect or the recall or the performance of the recall on the vehicle – something that never fixed the vehicle.

73. Had plaintiffs known at time of sale that the vehicle suffered from the defect, plaintiffs would never have purchased the vehicle.

74. Instead, defendants omitted the existence of the defect from plaintiffs, thereby causing plaintiffs to purchase the vehicle.

75. Because the defect posed a danger to plaintiffs' and plaintiffs' children who are regularly passengers in the vehicle, defendants had a duty to disclose the defect to

plaintiffs before the sale.

76. Upon information and belief, on 12-20-18, Honda issued another interactive service message, this one being titled "2018-19 Odyssey Power Sliding Door Rear Latch Kit Availability." Exhibit F.

77. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the selling dealership that showed plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever mentioned the defect or the aforesaid prehistory repair performed to the vehicle.

78. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature about the defect or aforesaid prehistory repair performed to the vehicle.

79. Upon information and belief, before plaintiffs purchased the vehicle from the selling dealer, none of the employees of the selling dealership that showed plaintiffs the vehicle or were involved in the sale of the vehicle to plaintiffs ever gave plaintiffs any literature mentioning or referring to the defect or the aforesaid prehistory repair performed to the vehicle.

80. Upon information and belief, before plaintiffs purchased

the vehicle from the selling dealer, none of the employees of the manufacturer ever forwarded plaintiffs any literature mentioning or referring to the defect or aforesaid prehistory repair performed to the vehicle.

81. When plaintiffs purchased the vehicle, plaintiffs were totally unaware of the defect.

82. At time of sale, the selling dealer issued plaintiffs the warranty with various coverage periods for various components, including but not necessarily limited to the following: "New Vehicle Limited Warranty...Every new Honda is covered, including the 12-volt battery, for 3 years or 36,000 miles, whichever comes first. The tires are warranted separately. Powertrain Limited Warranty...The powertrain in your new Honda is covered for 5 years or 60,000 miles, whichever comes first."

83. Via the warranty, defendants made the following express promises to plaintiffs: "Honda will repair or replace any part that is defective in material or workmanship under normal use. See Proper Operation on page 35. All repairs/replacements made under this warranty are free of charge."

84. As will be seen below, defendants failed to fix the vehicle in a reasonable time and sold a vehicle to plaintiffs that defendants knew to be defective, such as by being defective

in material or workmanship under normal use.

85. Defendants thereby breached the terms of the warranty.

86. Neither before or at the time of the sale did the dealer did ask plaintiffs if they wanted to read the warranty.

87. Upon information and belief, before the sale, the dealer didn't make the warranty available for plaintiffs to read. Instead, the warranty was given with the vehicle at the time that the vehicle was delivered to plaintiffs.

88. At all times relevant to this case, the warranty was a "warranty", which means any warranty, whether express or implied of the manufacturer of a new motor vehicle, or, in the case of a new motor vehicle that is an authorized emergency vehicle, of the manufacturer, co-manufacturer or post-manufacturing modifier, of the vehicle's condition and fitness for use, including any terms or conditions precedent to the enforcement of obligations under the warranty.[10]

89. At all times relevant to this case, the warranty was a "written warranty", which means — (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or

---

[10] N.J.S.A. 56:12-30.

workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking, which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.[11]

90. At all times relevant to this case, the warranty was a warranty which pertained to a consumer product actually costing plaintiffs more than $5 (i.e., the vehicle).[12]

91. As time of sale, one or more implied warranties covering the vehicle arose as a matter of law in plaintiffs' favor, with the term "implied warranty" meaning an implied warranty arising under State law (as modified by 15 U.S.C. 2308 and 2304(a)) in connection with the sale by a supplier of a consumer product.[13]

92. At all times relevant to this case, plaintiffs were

---

[11] 15 U.S.C. § 2301(6).
[12] 15 U.S.C. § 2302(2)(e).
[13] 15 U.S.C. § 2301(7).

entitled to seek repair attempts to the vehicle under the warranty for problems that plaintiffs experienced with the operation of the vehicle.

93. Following purchase, plaintiffs experienced problems with the vehicle's operation and pursuant to the manufacturer's new vehicle limited warranty, took the vehicle to various dealerships for multiple unsuccessful repair attempts. Exhibit A.

94. Many of those repair attempts occurred during the During the vehicle's warranty period and-or during the first 24,000 miles of operation or during the period of two years following the date of original delivery of the vehicle to plaintiffs (whichever occurred first). Exhibit A.

95. More specifically, following the sale of the vehicle to plaintiffs by the selling dealer and on or about 4-22-19, 10-25-19, 11-6-19, 11-25-19, 2-17-20, 3-4-20, 5-18-20, 6-11-20, 11-18-20, 11-25-20, 12-10-20, 3-2-21, 6-24-21, 10-6-21, 11-27-21, 1-14-22 and 3-15-22 and beginning when the vehicle's odometer registered approximately 4,903 miles, the vehicle underwent at least 16 repair attempts and spent well over a month at the manufacturer's franchise dealership – the dealer - for repair attempts for issues with sliding door operation, including the door's failure to close and/or opening on its own.

96. Every time that plaintiffs or plaintiffs' family took the vehicle to the dealer for service under the warranty for the problems, plaintiffs complained about the problems to the dealer's service advisors/managers, the names of which appear on invoices and in an email exchanged between plaintiffs' wife and a service advisor/manager and asked that the dealers fix the vehicle and/or note their complaints on invoices.   Exhibits A & M.

97. Plaintiffs or plaintiffs' family also took many videos of the problems occurring and shared one or more of those videos with the service department of the dealer while that department was attempting to diagnose the problems and at least one invoice issued to plaintiffs reflects the aforesaid.   Exhibit A.

98. Many of those complaints about the problems to the advisors/service managers commenced long before plaintiffs filed suit in this case. Exhibit A.

99. Plaintiffs were never charged by the dealer or defendants for those repairs and therefore, the repairs were clearly performed under the warranty as problems covered thereunder.

100. Upon information and belief, when the dealer performed warranty repair attempts to the vehicle, neither the dealer or defendants ever claimed that those attempts to repair

the problems weren't covered under the warranty for any reason at all, such as because the vehicle was abused, misused, modified, neglected or improperly maintained.

101. Upon information and belief, plaintiffs fear for their safety in the vehicle due to the malfunctioning doors and fear parking the vehicle in parking lots lest someone gain access to the vehicle due to its doors' failure to close properly and/or opening while the vehicle is parked and after attempts are made to lock the doors.

102. While the recall was performed to the vehicle, that recall failed to fix the vehicle in a reasonable time, with approximately 16 repairs occurring to the vehicle's sliding doors following the performance of that recall, the recall failed to fix the defect.

103. Due to the repeated repair attempts, plaintiffs view the problems as substantially impairing the use, value and safety of the vehicle. While expert testimony isn't required in NCLL and breach of warranty cases such as this one, these claims of are bolstered by the findings of the expert, whose report is attached hereto. Exhibit H.

104. The vehicle's use is substantially impaired because the doors fail to work properly – i.e., properly open and close. This is bolstered by the findings of the expert, whose report is attached hereto. Exhibit H.

105. The vehicle's safety is substantially impaired because the doors' failure to close and their opening without warning poses a danger to the vehicle occupants and makes the vehicle less secure when parked, as strangers wanting to do harm to plaintiffs or wanting to steal plaintiffs' possessions may do so with relative ease and impunity.

106. The vehicle's use is substantially impaired because the vehicle's repair history substantially impairs the value of the vehicle to plaintiffs – i.e., they didn't get the benefit of their bargain and further, if they sell or trade the vehicle must disclose the repair history and receive less money for the vehicle.

107. Plaintiffs have no idea if or when the vehicle's problems will occur again, potentially requiring further repairs.

108. Once the warranty is over, plaintiffs will have to pay for future repair attempts to address the problems.

109. In addition, the vehicle's repair history cannot be erased – instead, that history is a permanent blemish on the vehicle's value.

110. Accordingly, plaintiffs believe that the vehicle's use, value and-or safety is substantially impaired by the problems and plaintiffs' confidence in the vehicle is totally shaken.

111. While a statement may have been provided by the servicing

dealers each time plaintiffs picked up the vehicle following a repair attempt, the statements were not all accurate, as one or more invoices failed to state reported customer complaints or other information and/or stated misrepresentations about those customer complaints.

112. For example, on or about 3-2-21, after taking the vehicle to the selling dealer for a repair attempt to the driver and passenger side doors that did not always shut, the servicing dealer issued plaintiffs an invoice that, in violation of the manufacturer's obligation under the NCLL, failed to disclose the aforesaid customer complaint/concern.  Exhibit I

113. Accordingly, plaintiffs had to return to the dealer to secure a new invoice from the servicing dealer that in fact referred to the aforesaid customer complaint/concern. Exhibit I

114. Moreover, both invoices provided failed to specify whether the vehicle was returned to plaintiffs on the same date that it was brought to the selling dealer for said repair attempt.  Exhibit I.

115. This failure by the manufacturer to document a repeat concern undermined plaintiffs' ability to secure evidence crucial to the documentation of the problems and thereby threatens to endanger plaintiffs' claims pled herein by

undermining plaintiffs' ability to prove the particulars of plaintiffs' complaints about the vehicle and length of time required for repairs to the vehicle.[14]

116. By way of example, the NCLL states: "[e]ach time a consumer's motor vehicle is returned from being examined or repaired during the period specified in section 3 of P.L.1988, c.123 (C.56:12-31), the manufacturer, or, in the case of an authorized emergency vehicle, the manufacturer, co-manufacturer, or post-manufacturing modifier, through its dealer or distributor, shall provide to the consumer an itemized, legible statement of repair which indicates any diagnosis made and all work performed on the vehicle and provides information including, but not limited to, the following: a general description of the problem reported by the consumer or an identification of the problem reported by the consumer or an identification of the defect or condition and the source of the defect; the amount charged for parts and the amount charged for labor, if paid for by the consumer; the date and the odometer reading when the vehicle was submitted for repair; and the date and odometer reading when the vehicle was made available to the consumer." [15]

---

[14] N.J.S.A. 56:12-34(b).
[15] N.J.S.A. 56:12-34(b).

117. That conduct of failing to properly document repairs speaks of bad faith during the course of subsequent performance of service under the warranty.

118. This documentation of the repair attempt process can be crucial to the warranty tracking process and to notify defendants of recurring issues with vehicles that defendants sells, distributes and warrants.  Exhibit B, p. 3.

119. Defendants maintain a computerized database of all the warranty repairs and resources for defendants' franchise dealerships to use to attempt to repair vehicle issues or nonconformities complained of by vehicle purchasers to said dealerships (e.g., "Tech Line" and index of service campaigns and technical service bulletins).  Exhibit B.

120. Therefore, defendants provide technical support to franchise dealerships performing repair attempts under the warranty.  Exhibit B, p. 3.

121. Upon information and belief, for all work performed for which automotive dealerships seek reimbursement from defendants, those dealerships submit warranty claims to the manufacturer's warranty claims reimbursement department, thereby putting its employees on notice of the defect.

122. Defendants require defendants' franchise dealerships to submit forms for reimbursement for warranty repairs, which

include a description of the problem and the repairs being completed and those dealerships notify defendants of warranty issues.  Exhibit B, p. 4-5.

123. As explained above, every time a vehicle is brought to defendants' franchise dealerships for repairs under the warranty, said dealerships notify defendants of the issues that are the subject of the repair attempts and are frequently asked by said dealerships to authorize the performance of repair attempts (i.e., performance of labor and replacement of parts on the vehicle).

124. This fact is exemplified by the warranty invoices that the dealer prepared and issued to plaintiff and that refers to diagnosis and repairs attempted to repair the vehicle's door being done under "warranty". Exhibit A.

125. Upon information and belief, those invoices described parts and labor and also provided parts numbers relative to parts being ordered for or replaced on the vehicle under the warranty.  Exhibit A.

126. Upon information and belief, the names and/or technician numbers of said employees of defendants' authorized repair facilities performing said warranty repairs are stated on those invoices.

127. Upon information and belief, many of those repair invoices go into great detail about the diagnoses performed to the

vehicle, the parts replaced on the vehicle and the labor performed on the vehicle and they discuss many instances during which repair attempts were performed involving the problems and the conditions that led to such repair attempts.

128. Upon information and belief, many of those repair invoices refer to services being performed to the vehicle under the warranty, as job line items appearing on the invoices use the word "warranty" in the column stating whether the repairs were being performed on a cash basis, were being internally adjusted by to defendants' authorized repair facilities or were being submitted as warranty claims to defendants.

129. Upon information and belief, after each visit that the complaining consumers made to defendants' authorized repair facilities to get the vehicle repaired under the warranty, to defendants' authorized repair facilities submitted those invoices to the warranty claims reimbursement department of defendants so that to defendants' authorized repair facilities could get paid under the warranty.

130. Upon information and belief, after each visit that the complaining consumers made to defendants' authorized repair facilities to get the vehicle repaired under the warranty and via to defendants' authorized repair facilities'

submission of requests for reimbursement for those claims, the personnel of defendants' warranty claims department were thereby informed of the problems and the complaining consumers' repeat demands that the vehicle be fixed and of defendants' authorized repair facilities' failure to fix the vehicle in a reasonable time under the warranty.

131. Upon information and belief, the employees of the manufacturer's management department had access to that information and therefore, were clearly aware of the defect.

132. Defendants' access to warranty claims submitted by defendants' franchise dealerships is confirmed at by the privilege log produced by defendants in discovery, which reflects warranty histories and internal communications prepared/maintained by defendants about the vehicle's warranty history and by the warranty records summary produced by defendants in discovery, which refers to specific repair attempts and manufacturer codes assigned for same.  Exhibit A & K.

133. Therefore, it is beyond question that defendants, via complaints made to defendants' franchise dealerships by other purchasers of Honda Odysseys before plaintiffs purchased the vehicle: (1) had knowledge of the problems long before plaintiffs purchased the vehicle; and (2), were

asked by other consumers purchasing Honda Odysseys to perform repair attempts to address the problems, such as via final repair attempt letters forwarded by consumers or their attorneys pursuant to the NCLL, MMWA or other comparable statues.

134. Upon information and belief, before the sale, the employees of the legal department and employees of the management department of defendants had access to the records of defendants' warranty claims department and accessed those records and therefore, were thereby informed of the defect by complaining consumers and demands that the vehicle be fixed and franchise dealers' failure to fix class vehicles in a reasonable time.

135. Further, upon information and belief, many of those complaining consumers called the manufacturer's customer service line and spoke with representatives of the manufacturer and during said calls, the complaining consumers advised those representatives about the complaining consumers' repeat demands that their vehicle be fixed and about defendants' authorized repair facilities' failure to fix the vehicle in a reasonable time under the warranty.

136. Upon information and belief, the employees of the legal department and employees of the management department of

defendants had access to the records of defendants'
customer claims department and accessed those records and
therefore, were thereby informed of the problems and the
complaining consumers' repeat demands that the vehicle be
fixed and of defendants' authorized repair facilities'
failure to fix the vehicle in a reasonable time under the
warranty.

137. Therefore, upon information and belief, via the customer
service department's records of discussions with those
complaining consumers that called said department,
defendants had actual knowledge of the complaining
consumers' repeat demands that the vehicle be fixed and of
defendants' authorized repair facilities' failure to fix
the vehicle in a reasonable time under the warranty.

138. Upon information and belief, all class vehicles are
similarly equipped with the door and therefore, all suffer
from the same defect.

139. Whether that defect is caused by materials or workmanship
or design is a question of fact that must be resolved in
the course of discovery but what is abundantly clear is
that defendants never refused to make repair attempts to
the vehicle because the defect fell outside the scope of
warranty coverage.  Exhibit A.

140. Accordingly, defendants are estopped from belatedly

claiming after performing at least 16 repair attempts that the problems or the defect is outside the scope of warranty coverage.

141. Upon information and belief, this fact of a year, make and model wide defect was clear to the employees of defendants' management department and was also clear to the employees of defendants' technical department drafting the documents issued by defendants about the defect.

142. Despite that foreknowledge on the part of the employees of defendants' technical and management departments, the employees of defendants' management department made an intentional decision to fail to disclose the existence of that defect to plaintiffs before plaintiffs purchased the vehicle from the manufacturer's franchise dealership – the dealer.

143. Upon information and belief, neither defendants' legal department nor defendants' management acted on those customer complaints by: (1) instructing its franchise automotive dealerships not to sell the class vehicles line of vehicles; (2) ceasing production of said vehicles until defendants came up with a reliable solution to the defect; or (3) decided to notify prospective purchasers such as plaintiffs via franchise dealerships of the defect.

144. Instead, upon information and belief, the employees of

defendants' management department intended to omit information about the existence of the defects by hiding the data about the defect from purchasers and lessees such as plaintiffs and the class to induce them to continue purchasing and leasing class vehicles.

145. Upon information and belief, the employees of defendants' management department intentionally suppressed the existence of the defect to achieve more sales and leases and the continued distribution and sale of more class vehicles to defendants' franchise dealerships.

146. As detailed above, the defect made the vehicle dangerous and therefore, defendants owed plaintiffs the duty to disclose the defect before the sale and to issue a recall of the vehicle.

147. Given the knowledge at the fingertips of the employees of defendants' management department, defendants had a duty to disclose that information and to take corrective action, especially since the defect made the vehicle dangerous. Exhibit A.

148. Nevertheless, upon information and belief, defendants' management made a conscious decision to put profits ahead of stopping the sale of class vehicles with their then unfixable defect – a defect that, as of the filing of this pleading, remains unfixed and that, regardless of any fix,

substantially impairs the use, value and safety of all class vehicles similarly equipped with the same door locking mechanism.

149. Upon information and belief, this conscious decision was taken well before the sale as shown by the many customer complaints that led to the recall.

150. The NCLL imposes various reporting requirements on manufacturers relative to vehicles with inherent design defects and on the manufacturer and DCA relative to vehicles repurchased by manufacturers as lemons.

151. Those reporting requirements alerted defendants' legal department to ongoing defects in the class vehicles such as the defect and shall make it easier for plaintiffs, during discovery in this case, to determine the class members' identities.

152. The NCLL requires manufacturers to "shall certify to the division, within one year of discovery, the existence of any inherent design defect common to all motor vehicles of a particular model or make."[16]

153. Under the NCLL, a manufacturer commits a per se CFA violation if they fail to perform that certification.

154. Upon information and belief, discovery in future may

---

[16]. N.J.S.A. 56:12-44.

reveal in violation of the CFA, defendants failed to perform that certification process notwithstanding defendants having knowledge that the problems were an inherent design defect of the vehicle.

155. Pursuant to the NCLL regulations adopted by the DCA, the Division of Consumer Affairs shall maintain an index of all motor vehicle disputes by make and model and shall compile and maintain statistics indicating the record of manufacturer compliance with any settlement procedure decisions and the index and statistical record of compliance shall be made available to the public.[17]

156. The index maintained by the DCA currently reflects defendants' lemon repurchase of the following vehicles assigned the following vehicle identification: 2018 HONDA ODYSSEY 5FNRL6H72JB002337 2018 HONDA ODYSSEY 5FNRL6H9XJB008131 2018 HONDA ODYSSEY 5FNRL6H78JB009776 2018 HONDA ODYSSEY 5FNRL6H96JB054068 2018 HONDA ODYSSEY 5FNRL6H7XJB094930 2018 HONDA ODYSSEY 5FNRL6H91JB042068 2018 HONDA ODYSSEY 5FNRL6H7XJB059613 2018 HONDA ODYSSEY 5FNRL6H96JB000267 2018 HONDA ODYSSEY 5FNRL6H74JB025229 2018 HONDA ODYSSEY 5FNRL6H23JB048781 2018 HONDA ODYSSEY 5FNRL6H27JB032275 2018 HONDA ODYSSEY 5FNRL6H74JB002291 2018

---

[17] N.J.A.C. 13:45A-26.15.

HONDA ODYSSEY 5FNRL6H52JB093785 2018 HONDA ODYSSEY

5FNRL6H78JB069945 2018 HONDA ODYSSEY 5FNRL6H71JB100419 2018

HONDA ODYSSEY 5FNRL6H95JB105253 2018 HONDA ODYSSEY

5FNRL6H8XJB030394 2018 HONDA ODYSSEY 5FNRL6H95JB079799.[18]

157. In addition, other model years of Honda Odyssey were likewise repurchased, such as 2016 and 2019 model years of Honda Odyssey.[19]

158. Discovery may reveal that the reason for some or many of these repurchases was the defect – something reported long ago and before the sale and known to defendants' legal department as reflected by the DCA's requirement that defendants disclose defects and report them and disclose repurchased lemon vehicles.

159. Pursuant to the NCLL, "a. If a motor vehicle is returned to the manufacturer, or, in the case of an authorized emergency vehicle, to the manufacturer, co-manufacturer, or post-manufacturing modifier, under the provisions of this act or a similar statute of another state or as the result of a legal action or an informal dispute settlement procedure, it shall not be resold or re-leased in New

---

[18] https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf, last checked on 5-18-22.
[19] https://www.njconsumeraffairs.gov/llu/Documents/Vehicles-Branded-Under-The-New-Jersey-Lemon-Law.pdf, last checked on 5-18-22.

Jersey unless: (1) The manufacturer, co-manufacturer, or post-manufacturing modifier provides to the dealer, distributor, or lessor, and the dealer, distributor or lessor provides to the consumer, the following written statement on a separate piece of paper, in 10-point bold-face type: "IMPORTANT: THIS VEHICLE WAS RETURNED TO THE MANUFACTURER OR OTHER RESPONSIBLE PARTY BECAUSE IT DID NOT CONFORM TO THE MANUFACTURER'S OR OTHER PARTY'S WARRANTY FOR THE VEHICLE AND THE NONCONFORMITY WAS NOT CORRECTED WITHIN A REASONABLE TIME AS PROVIDED BY LAW;" (2) The dealer, distributor, or lessor obtains from the consumer a signed receipt certifying, in a conspicuous and understandable manner, that the written statement required under this subsection has been provided. The director shall prescribe the form of the receipt. The dealer, distributor, or lessor may fulfill his obligation to obtain a signed receipt under this paragraph by making such a notation, in a conspicuous and understandable manner, on the vehicle buyer order form accompanying the sale or lease of that vehicle; and (3) The dealer, distributor, or lessor, in accordance with the provisions of section 1 of P.L.1993, c.21 (C.39:10-9.3), notifies the Chief Administrator of the Motor Vehicle Commission of the sale or transfer of ownership of the

motor vehicle."[20]

160. Upon information and belief, a review of the aforesaid record may reveal that other Odysseys were the subject of lemon treatment or classification before plaintiffs purchased the vehicle.

161. Disclosure during discovery of the reasons for other Honda Odyssey vehicles being branded lemons could reveal that one or more of the reasons were issues similar or identical to the problems.

162. As indicated by multiple unsuccessful repair attempts, defendants' never found a solution to the problems in a reasonable period of time and may indeed never find a solution or if found, that discovery may not occur during the period of coverage provided via the vehicle's warranty, resulting in the need for costly repairs out of pocket for problems that were covered by the warranty and should have been fixed in a reasonable time during the warranty's duration at no cost to consumer but that defendants never fixed in a reasonable time and during that duration and plaintiffs failed to receive the benefit of plaintiffs' bargain – e.g., a safe, reliable, valuable vehicle warranted against yet discovered problems or problems that

---

[20] N.J.S.A. 56:12-35.

could be addressed under the warranty in a reasonable period of time.

163. Instead, before plaintiffs purchased the vehicle, defendants had advanced knowledge, through the complaints of other consumers purchasing 2019 Honda Odysseys, that those vehicles had problems which defendants were unable to successfully repair in a reasonable time.

164. The vehicle's warranty and the protections afforded to consumer via the NCLL are crucial to the purchasers of vehicles manufactured, assembled and distributed by defendants to which the warranty an the NCLL applies, as the warranty and the NCLL influences consumers' decisions to purchase vehicles covered by the warranty and NCLL.

165. As the Appellate Division explained: [21] "[w]arranties developed in the law ... to protect the ordinary consumer who cannot be expected to have the knowledge or capacity ... to make adequate inspection of mechanical instrumentalities, like automobiles, and to decide for himself whether they are reasonably fit for the designed purpose." *Henningsen, supra,* 32 *N.J.* at 375, 161 *A.*2d 69. An express warranty for a new automobile is not provided gratuitously by the manufacturer or seller. The cost of the

---

[21] *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012).

warranty is included in the cost of the product. The consumer has purchased the warranty along with the car. It is "part of the benefit of the bargain." *Thiedemann v. Mercedes-Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

166. Express warranties are used by manufacturers to increase the attractiveness of their products to consumers. The inclusion of warranties is not a result of corporate benevolence. Conversely, purchasers rely on warranties; they reasonably expect them to have meaning beyond a mere promise of replacement.[22]

167. A warranty is intended to give consumers peace of mind that any problems with the vehicle arising during the applicable coverage periods of the warranty can and shall be addressed in a reasonable time and if not, that consumers shall have recourse to the law to seek damages such as the remedy of revocation of acceptance and the NCLL statutory refund.

168. Therefore, while a warranty is not a guarantee against all issues that may arise in the operation of a vehicle, the warranty forms an important marketing tool, providing a consumer peace of mind that problems with a warranted

---

[22] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980)(Pashman, J., concurring).

vehicle's operation, brought to the manufacturer's attention during that period, can and shall be fixed by the vehicle's manufacturer in a reasonable time.

169. However, in this case, before plaintiffs purchased the vehicle, defendants: (1) knew that the problems existed; (2) were unable to fix those problems in a reasonable time – as shown from warranty repair experience with other 2019 Honda Odyssey owners; and (3) proceeded to manufacture, assemble and distribute the vehicle into the stream of commerce with its warranty to its ultimate end user, plaintiffs.

170. Therefore, since certain Honda Odysseys suffer from known issues that defy repair and since defendants had knowledge of those issues before distributing those Honda Odysseys to dealerships for sale and lease to the public, the efficacy of the warranties issued with those Honda Odysseys was in doubt before the class vehicles were sold and leased.

171. Accordingly, acting in bad faith, defendants lured plaintiffs to consider purchasing the vehicle, marketed and sold as it was with its warranty but without disclosure of the problems that were unable to be fixed in a reasonable time under the warranty.

172. As reflected by the vehicle's repair history, before filing suit, plaintiffs gave defendants multiple efforts to

cure the problems but defendants failed to fix the problems in a reasonable time.  Exhibit A.

173. Moreover, as explained above, since defendants knew about the problems at the time of purchase, defendants had ample opportunity before the sale to cure the breach of warranty.

174. Accordingly, plaintiffs retained counsel relative to this dispute and, via a letter addressed to the manufacturer, plaintiffs provided a final repair attempt to defendants. Exhibit M.

175. The manufacturer thereafter acknowledged receipt of that letter and upon information and belief, availed itself of the final repair attempt, which failed to fix the vehicle. Exhibits A & M.

176. Despite the many failed repair attempts and acting in bad faith, defendants failed to repurchase the vehicle from plaintiffs.

**CLASS ACTION ALLEGATIONS**

177. For the present, the class action allegations pled in this document apply to the breach of express and implied warranty claims only and not to any other claims pled in this case.

178. Plaintiffs bring this putative class action for damages, repurchases, refunds, equitable and injunctive relief on behalf of themselves and applicable New Jersey citizens.

179. More specifically and subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, plaintiffs propose the following class of New Jersey citizens who purchased or leased a 2018 or older Honda Odyssey vehicle (class vehicle) manufactured or assembled or distributed by defendants, with the vehicle being purchased or registered in New Jersey.

180. Excluded from the class are: (a) defendants, any entity in which defendant has a controlling interest and its legal representatives, officers, directors, employees, assigns and successors; (b) the Judges to whom this case is assigned and any member of the Judges' staff or immediate family; and (c) class counsel.

181. Plaintiffs seek only damages and injunctive relief on behalf of themselves and the class members. Plaintiffs disclaim any intent or right to seek any recovery in this

action for personal injuries, wrongful death, or emotional distress suffered by plaintiffs and/or the class members.

182. Defendants are in exclusive possession, custody and control of the list of persons who were class members in the prior case and any other cases.

183. While there may be other cases pending against defendants, upon information and belief, the proposed class members' claims in this matter don't overlap with those other pending cases.

184. It isn't the intent to have overlapping classes and any overlap will be ameliorated through amendment if facts show that they do overlap.

185. Defendants' actions are not isolated.

186. Defendants' actions have affected similarly situated individuals throughout the State of New Jersey.

187. Defendants acted on grounds generally applicable to the class members, thereby justifying relief against defendants for the class members as whole.

188. Plaintiffs are members of the class that they seek to represent.

189. The class is believed to number at least hundreds, if not thousands, of persons and their joinder is impracticable, except by via a class action.

190. The disposition of the claims of the class in a class

action will benefit both the parties and the Court.

191. There are questions of law and/or fact common to the class predominating over any question affecting only individual class members as to whether defendants are liable to plaintiffs for violation of applicable law. For instance, are defendants liable for the class action claims pled in the complaint?

192. Class certification is also appropriate because defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to plaintiffs and the class members.

193. Specifically, plaintiffs seek injunctive relief via a court judgment or order requiring an end to the unlawful practices and/or the issuance of a corrective or explanatory notice to the class members.

194. Plaintiffs' claims are typical of the claims of the class insofar as named class representatives and the members of the class were similarly exposed to the statutory harms alleged herein and were similarly injured and/or face similar risks therefrom.

195. The proposed class representatives state a claim upon which relief can be granted that is typical of the claims of absent class members.  If brought and prosecuted individually, the claims of each class member would

necessarily require proof of the same material and
substantive facts, rely upon the same remedial theories,
and seek the same relief.

196. Plaintiffs will fairly and adequately represent the
interests of the class insofar that the plaintiffs' claims
are typical of those of the class members.

197. Plaintiffs are committed to the vigorous representation of
the class members.

198. Plaintiffs retained counsel experienced and skilled in
consumer law and class action litigation.

199. Plaintiffs have no conflict of interest in the maintenance
of this class action.

200. If the matter is maintained as a class action, it shall
provide for a fair and efficient adjudication of this
dispute.

201. The claims and remedial theories pursued by the named
class representative are sufficiently aligned with the
interests of absent class members to ensure that the
individual claims of the class will be prosecuted with
diligence and care by the individual plaintiffs as class
representatives.

202. Contrawise, especially in view of the small dollar amounts
in controversy relative to the individual plaintiffs'
claims, it would be impracticable and undesirable for each

member of the class who suffered harm to bring a separate action.

203. Further, the maintenance of separate actions in lieu of the instant proposed class action would place a substantial and unnecessary burden on the courts and could result in inconsistent adjudications.

204. Contrawise, a single class action such as the instant proposed class action can determine the rights of all class members while economizing judicial resources.

205. Moreover, as plaintiffs invoked consumer protection statutes and have pled a prima facie case for the violation of same, the policy goals behind those consumer protection statutes provide further reason for permitting class action certification of the instant action.

206. The benefits of adjudicating this case via a class action far outweigh any difficulties in management of the case as a class action.

207. Class action treatment of this case is a superior method for the fair and efficient adjudication of this dispute because:

- individual claims by the class members are impractical as the costs of pursuit far exceed what any one plaintiff or class member has at stake;

- as a result, there has been no other litigation over the controversies herein;

- individual members of the class have no interest in prosecuting and controlling separate actions; and

- the proposed class action is manageable.

- the proposed class is readily ascertainable.

208. Certification of the class under R. 4:32 or Rule 23(b)(2) of the Federal Rules of Civil Procedure is appropriate because defendants acted on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

209. Certification of the class under R. 4:32 or Rule 23(b)(3) of the Federal Rules of Civil Procedure is appropriate in that: (a) the questions of law or fact common to the members of the class predominate over any questions affecting an individual member; and (b) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

210. Class treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual lawsuits would entail.

211. Absent a class action, many members of the class will

likely not even obtain relief, whether because they are
unaware of their right to relief from the harm caused by
defendants' illegal practices, due to the prohibitive time
and monetary cost inherent in individual litigation, or
otherwise.

212. While the exact number of class members is unknown to
plaintiffs at this time and can only be determined by
appropriate discovery, membership in the class is
ascertainable based upon the records maintained by
defendants and governmental officials.

213. Upon information and belief, during the relevant time
periods, over one hundred of the class vehicles, if not
thousands of class vehicles, were sold to New Jersey
citizens or are registered to New Jersey citizens in New
Jersey.

214. Therefore, the class members are so numerous that
individual joinder of all class members is impracticable
under R. 4:32 or Fed. R. Civ. P. 23(a)(1).

215. Plaintiffs' claims are typical of the claims of the class
members whom they seek to represent under R. 4:32 or Fed.
R. Civ. P. 23(a)(3) because plaintiffs and each class
member have a vehicle with the same problems.

216. Plaintiffs will fairly and adequately represent and
protect the interests of the class members as required by

R. 4:32 or Fed. R. Civ. P. 23(a)(4).

217. Plaintiffs are adequate representatives because their interests do not conflict with the interests of the class members and intend to vigorously prosecute this case.

218. Further, plaintiffs retained counsel (i.e., Lewis Adler and Paul Depetris) competent and experienced in complex class action litigation, including putative automotive warranty class action litigation and New Jersey CFA litigation and who together certified at least eight (8) class actions and intend to vigorous prosecute this case vigorously.

219. Therefore, the interests of the class members will be fairly and adequately protected.

220. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to class members predominate over any questions affecting only individual members and a class action is superior to any other available means for fairly and efficiently adjudicating the controversy.

221. The class members' interests in individually controlling the prosecution of separate actions is low given the magnitude, burden, and expense of individual prosecutions against large merchants such as defendants.

222. Plaintiffs nor their counsel are aware of any pending

litigation concerning this controversy already begun by any of the class members.

223. It is desirable to concentrate this litigation in this forum to avoid burdening the courts with individual lawsuits.

224. As interpreted by New Jersey courts, New Jersey consumer statutes lend themselves to class action treatment, lest viable individualized consumer claims go unprosecuted due to the dubious utility of prosecuting them on individual bases.

225. Further, individualized litigation presents a potential for inconsistent or contradictory results and increases delay and expense to all parties and the court system presented by the legal and factual issues of this case.

226. The proposed class action has no management difficulties.

227. Defendant's records and the records available publicly will easily identify the class members.

228. As the problems are common to all the class vehicles, the same documents and testimony shall prove plaintiffs' and the class members' claims.

229. If the case proceeds as a class action, the parties and the court system shall benefit via a single adjudication, economies of scale and comprehensive supervision by a single court.

230. A class action is appropriate under R. 4:32 or Fed. R. Civ. P. 23(b)(2) because, as detailed above, defendants acted or refused to act on grounds applicable generally to the class members, so that final injunctive relief or corresponding declaratory relief is appropriate as to all class members.

## COUNT 1

### BREACH OF EXPRESS WARRANTY

#### PLED BY PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

231. The allegations contained in the previous paragraphs are repeated as if fully set forth.

232. This count is plead by plaintiffs and the class against defendants.

233. Since the vehicle are goods, the UCC applies to this dispute.[23]

234. Plaintiffs hereby plead the following: (1) the existence of a written warranty issued by defendant; (2) problems with the vehicle arising during the warranty; (3) defendants' failure to fix a vehicle in a reasonable time (including the details of multiple repair attempts – dates, vehicle mileage, invoice numbers, customer complaints and the alleged repairs attempted) resulting in a material breach; (4) damages via the vehicle's value being substantially impaired; and (5) revocation of acceptance.[24]

---

[23] As explained by the Appellate Division: Article 2 of the UCC applies to transactions in goods. N.J.S.A. 12A:2-102. "`Goods' mean all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities and things in action." N.J.S.A. 12A:2-105(1). *DiIorio v. Structural Stone & Brick*, 845 A.2d 658, 368 N.J. Super. 134 (N.J. Super., 2004).
[24] New Jersey Model Civil Jury Charge 4:21.

235. At the time of sale and/or thereafter, defendants or their agents issued plaintiffs the warranty, which was an express warranty in accordance with the UCC and/or the MMWA.

236. Under the UCC "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."[25]

237. The warranty met the UCC's description of a warranty.

238. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the warranty.

239. Defendants expressly warranted the labor that defendants performed or caused to be performed to the vehicle and/or parts that defendants replaced or caused to be replaced on the vehicle.

240. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

241. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

242. Defendants expressly warranted the labor that defendants performed or caused to be performed to the vehicle and/or

---

[25] *N.J.S.A.* 12A:2-313(1)(a).

parts that defendants replaced or caused to be replaced on the vehicle.

243. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

244. Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle wasn't as warranted.

245. For, the vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

246. During the vehicle's warranty period, plaintiffs presented the vehicle to the dealerships for the dealerships, reported the problems to the dealerships and those dealerships performed repair attempts to the vehicle relative to the problems.

247. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

248. As detailed above, while the warranty was in effect, defendants or their agents the dealerships were unable to repair or correct the problems within a reasonable time.

249. By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

250. As reflected by the vehicle's repair history, before filing suit, plaintiffs gave defendants a reasonable time to cure the problems but defendants failed to fix the problems in a reasonable time.

251. Moreover, as explained above, since defendants knew about the problems at the time of the failure (or even perhaps, at the time of the sale of the vehicle), defendants had ample opportunity before the sale to cure the breach of warranty.

252. To the extent that via the vehicle's warranty booklet, defendants attempt to disclaim liability for consequential damages and thereby limit the warranty to one simply providing a repair remedy, such an effort is fruitless.

253. Such limitation language fails to negate plaintiffs' damages claims because where a limited repair remedy fails of its essential purpose (i.e., failing to fix a vehicle in a reasonable time), the repair remedy limitation is no impediment to the consumer's recovering consequential

damages.

254. Warranty disclaimers shouldn't bar the complaint.  An express warranty for a new automobile is not gratuitous. "The cost of the warranty is included in the cost of the product. The consumer has purchased the warranty along with the car. It is 'part of the benefit of the bargain.'"[26]

255. Manufacturers use express warranties as marketing tools to increase product attractiveness; they aren't given via corporate benevolence.

256. Purchasers rely on warranties to have meaning beyond a mere promise of replacement.[27]

257. A new vehicle together with its warranty are intended to give consumers peace of mind that any problems with the vehicle arising during the applicable coverage periods of the warranty can and shall be addressed in a reasonable period of time and if not, that consumers shall have recourse to the law to seek damages such as the remedy of revocation of acceptance and the NCLL statutory refund.[28]

258. Nor were plaintiffs able to negotiate the limited warranty

---

[26] *Thiedemann v. Mercedes-Benz USA, LLC,* 183 *N.J.* 234, 251, 872 *A.*2d 783 (2005).

[27] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320, 416 A.2d 394 (1980)(Pashman, J., concurring).

[28] See *Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J. Super. 441, 458, 240 A.2d 195 (Law Div. 1968); accord, *Lemaldi v. De Tomaso of America, Inc.*, 383 A.2d 1220, 156 N.J. Super. 441, 447 (Law Div. 1978).

that failed of its essential purpose:[29]  "[t]he purchaser of a mass produced consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms.  Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis.  The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers."

259. Further, the Third Circuit explained:[30] "The Standard Warranty's cost is built into the price of each new vehicle sold by Ford to the dealer and by the dealer to the end consumer. Purchasers of Ford vehicles do not pay any additional consideration for the Standard Warranty nor can they purchase new vehicles without the Standard Warranty."

260. Limitations on liability are frowned upon and unless bargained for, are generally unenforceable[31] and consumers can't bargain:[32] "[t]he gross inequality of bargaining position occupied by the consumer in the automobile

---

[29]*Gladden v. Cadillac Motor Car Div.*, 416 A.2d 394, 83 N.J. 320, 335(1980).
[30] *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 171 F.3d 818 (3rd Cir. 1999).
[31] *Jasphy v. Osinsky*, 834 A.2d 426, 364 N.J. Super. 13 (App. Div. 2003); *Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 32 N.J. 358 (1960); *Gladden v. Cadillac Motor Car Div.*, 416 A.2d 394, 83 N.J. 320 (1980).
[32] *Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 32 N.J. 358 (1960).

industry is thus apparent. There is no competition among the car makers in the area of the express warranty. Where can the buyer go to negotiate for better protection? Such control and limitation of his remedies are inimical to the public welfare and, at the very least, call for great care by the courts to avoid injustice through application of strict common-law principles of freedom of contract. Because there is no competition among the motor vehicle manufacturers with respect to the scope of protection guaranteed to the buyer, there is no incentive on their part to stimulate good will in that field of public relations."

261. One District Court observed:[33]  "Courts have held that a warranty is substantively unconscionable when a car manufacturer knew 'that class engines would fail after the end of the warranty period but before the vehicle's expected useful life….' Courts have held that a warranty is procedurally unconscionable when the manufacturer knew of the defect and concealed it while the consumer had no means to negotiate the warranty."

---

[33] *Opheim v. Volkswagen Aktiengesellschaft*, No. 20-02483 (D. N.J. Jun. 25, 2021)(citing *Gelis v. Bayerische Motoren Werke Aktiengesellschaft*, Civ. No. 17-7386, 2018 WL 6804506, at *18 (D.N.J. Oct. 30, 2018); *DeFrank v. Samsung Elecs. Am., Inc.*, Civ. No. 19-21401, 2020 WL 6269277, at *17 (D.N.J. Oct. 26, 2020))."

262. "It is to be emphasized that we are here dealing with words of exclusion or limitation contained in a contract document that is not the product of mutual negotiation or cooperative draftsmanship. The purchaser of a mass-produced consumer article with a standard warranty form or booklet, as in this case, has no opportunity to bargain over its terms. Warranties are prepared unilaterally by the company and distributed automatically with the product on a mass basis. *Henningsen v. Bloomfield Motors, Inc.*, supra, 32 N.J. at 390. The consumer must ordinarily place considerable reliance upon the fairness and good faith of the manufacturer and its dealers. It has therefore been recognized that the reliance which a consumer necessarily reposes in a seller engenders a corresponding responsibility on the seller. See id. at 399." [34]

263. The New Jersey Supreme Court explained:[35] "[t]he disclaimer of the implied warranty and exclusion of all obligations except those specifically assumed by the express warranty signify a studied effort to frustrate that protection…. The lawmakers did not authorize the automobile manufacturer to use its grossly disproportionate bargaining

---

[34] *Gladden v. Cadillac Motor Car Div.*, 83 N.J. 320 (1980).
[35] Henningsen v. Bloomfield Motors, Inc., 161 A.2d 69, 32 N.J. 358 (1960).

power to relieve itself from liability and to impose on the ordinary buyer, who in effect has no real freedom of choice, the grave danger of injury to himself and others that attends the sale of such a dangerous instrumentality as a defectively made automobile… Chrysler's attempted disclaimer of an implied warranty of merchantability and of the obligations arising therefrom is so inimical to the public good as to compel an adjudication of its invalidity."

264. Per the Third Circuit,[36] warranty disclaimers are invalid when the limited repair remedy fails of its essential purpose.

265. To be effective, the limited repair remedy must be provided in reasonable time or the warranty fails of its essential purpose, overcoming warranty disclaimers limiting damages to repair or replacement.

266. In such a situation as this, the substantial benefit of the purchase is lost, entitling the consumer to relief,[37] including revocation of acceptance. *N.J.S.A.* 12A:2-608(1).

267. Moreover, the MMWA bars defendants from disclaiming

---

[36] *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980).

[37] *G.M.A.C. v. Jankowitz*, 523 A.2d 695, 216 N.J. Super. 313, 329-331 (App. Div. 1987); *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980); *N.J.S.A.* 12A:2-719(2).

implied warranties because they issued express warranties.[38]

268. Plaintiffs failed to receive the benefit of plaintiffs' bargain – e.g., a safe, reliable, usable, valuable vehicle warranted against yet discovered problems or problems that could be addressed under the warranty in a reasonable period of time.

269. The vehicle is less valuable than if the vehicle didn't have the problems and the extensive repair history to attempt to repair the problems.

270. The vehicle's repair history cannot be erased – instead, that history is a permanent blemish on the vehicle's value.

271. The vehicle's use, value and safety are substantially impaired by defendants' failure to fix the problems in a reasonable time.

272. The vehicle's value has suffered from diminution.

273. Diminution in value is a standard supporting a breach of warranty.[39]

---

[38] 15 U.S.C. § 2308; *G.M.A.C. v. Jankowitz*, 523 A.2d 695, 216 N.J. Super. 313, 328 (App. Div. 1987); *Maloney v. Microsoft Corp.*, No. 09-2047 (D. N.J. Nov. 21, 2011).
[39] See, e.g., In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 816-17 (3d Cir. 1995) (emphasizing, in a class action suit, that section 2-714(1) of the UCC allows for damages "as determined in any manner which is reasonable"); *Perth Amboy Iron Works, Inc. v. Am. Home Assurance Co.*, 226 N.J. Super. 200, 219, 543 A.2d 1020 (App. Div. 1988); *McDonald v. Mianecki*, 79 N.J. 275, 282 n.1 (1979); accord *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 13, 860 A.2d 435 (2004) (applying UCC principles to a consumer fraud case and concluding that the cost

274. Further, breach of warranty damages need not be established with exact certainty: "[M]ere uncertainty as to the quantum of damages is an insufficient basis on which to deny the non-breaching party relief. Although it complicates the precise calculation of damages, our courts have long held that "[p]roof of damages need not be done with exactitude. ... It is therefore sufficient that the plaintiff prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate."[40]

275. As explained in the Restatement (Second) of Contracts: Alternative to Loss in Value of Performance § 348 (Am. Law Inst. 1981), a small windfall to the injured party based on an inability to prove exact damages should not defeat recovery.

276. Also, the injured party need not prove that he or she actually spent the money to repair the defect in order to recover for the breach.[41]

---

of replacing a damaged carpet was the appropriate measure of damages, as that method put the buyer in the position he would have been in if he had received a non-defective carpet).
[40] *Totaro, Duffy, Cannova and Co., LLC v. Lane, Middleton & Co., LLC*, 191 N.J. 1, 14, 921 A.2d 1100 (2007) (quoting *Lane v. Oil Delivery Inc.*, 216 N.J. Super. 413, 420, 524 A.2d 405 (App. Div. 1987) ).
[41] *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 22, 647 A.2d 454

277. The United States Supreme Court rejected the notion that a jury may not estimate damages.[42]

278. Given the repeated failure of defendants, via the selling dealer, to fix the vehicle's problems in a reasonable time, plaintiffs believe the vehicle's value is substantially impaired and plaintiffs' confidence in the vehicle is shaken.

279. Therefore, plaintiffs believe that the vehicle's use, value and/or safety is substantially impaired by the problems and plaintiffs' confidence in the vehicle is totally shaken.

280. The Third Circuit and New Jersey Supreme Court agree that negligence and bad faith play no part in warranty cases.[43]

281. Under the NCLL and UCC, proof of the existence of a problem in the vehicle or of negligence on any defendants'

---

(1994).

[42] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)("[a]lthough the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly").  See also *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ----, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016).

[43] *Chatlos Systems v. NCR Corp., Inc.*, 635 F.2d 1081, 1085-1086 (3rd Cir. 1980)("It is not necessary to show negligence or bad faith on the part of the seller…[t]he detriment to the buyer is the same whether the seller diligently but unsuccessfully attempts to honor his promise or acts negligently or in bad faith."); *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 372, 161 A.2d 69 (1960)("Recovery of damages does not depend upon proof of negligence or knowledge of the defect.").

part is not a prerequisite to a finding that the problems

substantially impair the vehicle's use and/or value and/or

safety. [44]

282. To establish the existence of a defect or nonconformity

impairing the product's vehicle's use or value, plaintiffs

need only identify the effect of a defect rather than

pinpointing its cause.[45]

283. Moreover, to establish a breach of warranty, plaintiffs

need not show that defendants acted negligently or in bad

faith.[46]

284. Moreover, at the pleading stage, no party can prove the

_____

[44]As stated by the court in *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226 (App. Div. 2012): "the plaintiff in a warranty action need not establish the existence of a defect; the failure of the goods to perform as warranted is sufficient." *Spring Motors, supra,* 98 *N.J.* at 586, 489 *A.*2d 660; *accord Gen. Motors Acceptance Corp. v. Jankowitz,* 216 *N.J. Super*. 313, 336, 523 A.2d 695 (App. Div.1987). Proof of causation must still be shown in a case based on breach of an express warranty, but "mere failure of promised performance is enough without proof of any defect." *Realmuto v. Straub Motors, Inc.,* 65 *N.J.* 336, 343, 322 A.2d 440 (1974) (citing *Collins v. Uniroyal, Inc.,* 64 *N.J.* 260, 262, 315 A.2d 16 (1974)). In *Jankowitz, supra,* 216 *N.J. Super.* at 320–22, 336–37, 523 A.2d 695, on facts that resemble those of this case, we held that the buyer of a new car was not required to produce expert evidence to prove that the manufacturer's and the seller's failure to repair the car was a breach of the express warranty they had provided.  See also *Ventura v. Ford Motor Corp.,* 180 *N.J. Super.* 45, 53–54, 433 *A.*2d 801 (App. Div.1981).
[45] *Christelles v. Nissan Motor Corp.,* 305 N.J. Super. 222, 228-229 (App. Div. 1997).
[46] *Chatlos Systems v. NCR Corp., Inc*., 635 F.2d 1081, 1085 (3rd Cir. 1980).

precise cause of defects.

285. In addition to other remedies available to consumers under the UCC for a breach of warranty, a UCC remedy available to consumers when a manufacturer fails to fix a vehicle in a reasonable period of time is revocation of acceptance.[47]

286. Nor does the vehicle's continued use compromise express or implied warranty claims at the pleading stage – at best, the reasonable of use is a jury question.[48]

287. Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle.

288. Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the UCC.

289. Accordingly, pursuant to the UCC, plaintiffs seek relief, including damages.

---

[47] *General Motors Acceptance Corp. v. Jankowitz*, 216 N.J. Super. 313 (App. Div. 1987); *Realmuto v. Straub Motors*, 65 N.J. 336 (1974); *Ford Motor Credit Co. v. Mendola*, 427 N.J. Super. 226, 242 (App. Div. 2012); See also Ventura v. Ford Motor Corp., 180 N.J. Super. 45, 53–54, 433 A.2d 801 (App. Div.1981).
[48] N.J.S.A. 12A:2-608(2); *MBCC v. Lotito*, 328 N.J. Super. 491 (App. Div. 2000)(Reasonableness of continued use is jury question); *Cuesta v. Classic Wheels, Inc.*, 358 N.J. Super. 512 (App. Div. 2003); *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 313 (App. Div. 1987).

## COUNT 2

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### PLED BY PLAINTIFFS AND THE CLASS AGAINST DEFENDANTS

290. The allegations contained in the previous paragraphs are repeated as if fully set forth.

291. This count is pled by plaintiffs and the class against defendants.

292. Every contract with a merchant for the sale of goods contains an implied warranty that the goods are fit for ordinary purposes for which the goods are used.  This warranty is known as the implied warranty of merchantability.[49]

293. Plaintiffs plead the following:[50] (1) defendants are merchants and in the business of selling goods of the kind involved; (2) the goods were not "merchantable" at the time of sale; (3) plaintiffs suffered loss; (4) the loss was proximately caused by the defective nature of the goods; and (5) notice was given to the seller of the loss.

294. The ordinary use of a vehicle is safe and reliable transport on roadways.[51]

---

[49] New Jersey Model Civil Jury Charge 4:22B.
[50] New Jersey Model Civil Jury Charge 4:22B.
[51] See *Henningsen v. Bloomfield Motors*, 32 N.J. 358, 161 A.2d 69 (1960)(discussing importance of automobile safety under the implied warranty of merchantability); *Berrie v. Toyota*, 267 N.J. Super. 152, 157 (App. Div. 1993)(Reasonable person in plaintiffs

295. At the time of sale and/or thereafter, in accordance with the UCC defendants impliedly warranted that the vehicle was of merchantable quality and/or was reasonably fit and/or suitable for the purpose for which it was purchased and/or defendants failed to properly disclaim such implied warranty.

296. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the aforesaid warranty.

297. Plaintiffs relied on said warranty and/or representations and believed them to be true and would not have purchased the vehicle but for said warranty.

298. Following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle was not as warranted.

299. Per its long repair history and the findings of the expert, the vehicle is not of merchantable quality – it doesn't provide safe or reliable transportation to its purchaser for use on the roadways.

300. Plaintiffs performed plaintiffs' obligations under the aforesaid warranty, including but not limited to plaintiffs' obligation to notify defendants of problems

---

position could readily conclude that a condition in which a car stalls and won't restart when parked on an incline impairs the use and value of the car and shakes her confidence in it).

that plaintiffs experienced with/exhibited by the vehicle and gave defendants a reasonable time to correct and/or repair and/or address said problems and defendants or their agents failed to correct and/or repair and/or address said problems in a reasonable time.

301. By failing to correct and/or repair and/or remedy the vehicle's problems within a reasonable time, defendants breached their obligations under the aforesaid warranty.

302. Defendants' failure to correct and/or repair and/or remedy the vehicle's problems within a reasonable time or to replace it with conforming goods in a reasonable time constitute a breach of the implied warranty of merchantability.

303. Defendants breached the implied warranty of merchantability because the vehicle was unfit for the ordinary purpose for which such goods are used – safe and reliable transportation on the State's roadways.

304. Therefore, defendants committed a breach of the implied warranty of merchantability under the UCC and/or under that of any other jurisdiction whose law the Court finds applies to the instant action.

305. Nor does the vehicle's continued use compromise implied warranty claims at the pleading stage – at best, the

reasonable of use is a jury question.[52]

306. The vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

307. Defendants' breach of warranty caused plaintiffs to suffer a diminution of value in the vehicle.

308. Accordingly, plaintiffs suffered damages by defendants' failure to comply with defendants' obligations under the UCC.

309. Accordingly, pursuant to the UCC, plaintiffs seek relief, including damages.

---

[52] N.J.S.A. 12A:2-608(2); *MBCC v. Lotito*, 328 N.J. Super. 491 (App. Div. 2000)(Reasonableness of continued use is jury question); *Cuesta v. Classic Wheels, Inc.*, 358 N.J. Super. 512 (App. Div. 2003); *G.M.A.C. v. Jankowitz*, 216 N.J. Super. 313 (App. Div. 1987).

**COUNT 3**

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY—FEDERAL TRADE COMMISSION IMPROVEMENT ACT PLED BY PLAINTIFFS ONLY (AND NOT THE CLASS)**

310. The allegations contained in the previous paragraphs are repeated as if fully set forth.

311. This count is pled by plaintiffs only (and not the class) against defendants.

312. The MMWA includes a private cause of action for consumers damaged by a breach of warranty as follows:  "(d) Civil action by consumer for damages, etc.; jurisdiction; recovery of costs and expenses; cognizable claims (1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief— (A) in any court of competent jurisdiction in any State or the District of Columbia; or (B) in an appropriate district court of the United States, subject to paragraph (3) of this subsection. (2) If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys'

fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

313. At the time of sale and/or thereafter, defendants failed to properly disclaim express or implied warranties in accordance with the UCC and/or the MMWA and/or defendants expressly and/or impliedly warranted that the vehicle was of merchantable quality and/or was reasonably fit and/or suitable for the purpose for which it was purchased.

314. Plaintiffs accepted the vehicle in the belief that the vehicle conformed to the express and implied warranties.

315. As detailed above, following delivery of the vehicle to plaintiffs and problems arising therewith, plaintiffs learned that the vehicle was not as warranted and therefore, plaintiffs have plead express and implied warranty claims.

316. For, the vehicle, as originally delivered and/or subsequent to repair, exhibited problems that substantially impair the vehicle's value to plaintiffs.

317. Plaintiffs substantially performed plaintiffs' obligations under the aforesaid warranty, including but not limited to

plaintiffs' obligation to notify defendants of problems
that plaintiffs experienced with/Exhibited by the vehicle
and gave defendants a reasonable time to correct and/or
repair and/or address said problems and defendants or their
agents failed to correct and/or repair and/or address said
problems in a reasonable time.

318. By failing to correct and/or repair and/or remedy the
vehicle's problems within a reasonable time, defendants
breached their obligations under the aforesaid warranties.

319. Since plaintiffs are entitled to relief pursuant to the
UCC, plaintiffs therefore, seek relief under the MMWA.

320. Defendants' failure to correct and/or repair and/or remedy
the vehicle's problems within a reasonable time constitutes
a breach of express warranty.

321. Pursuant to the MMWA, via one or more repair attempts
referenced in this pleading (Exhibit A) and before filing
suit, plaintiffs afforded defendants a reasonable
opportunity to cure defendants' failure to comply with the
warranty but defendants failed to render such compliance.

322. As detailed in the facts above, the requirements of the
MMWA are met by plaintiffs.

323. Defendants' breach of warranty caused plaintiffs to suffer
a diminution of value in the vehicle.

324. Accordingly, plaintiffs suffered damages by defendants'

failure to comply with defendants' obligations under the U.C.C. and/or MMWA and/or under the aforesaid warranty and thus bring this action against defendants for damages, attorney's fees and court costs.

## COUNT 4

### VIOLATION OF THE NEW JERSEY NEW CAR LEMON LAW

### PLED BY PLAINTIFFS ONLY (AND NOT THE CLASS) AGAINST DEFENDANTS

325. The allegations contained in the previous paragraphs are repeated as if fully set forth.

326. This count is pled by plaintiffs only (and not the class) against defendants.

327. Plaintiff seeks relief from defendant pursuant to N.J.S.A. 56:12-29, et seq., a/k/a the New Jersey Lemon Law or more properly, the New Jersey New Car Lemon Law (NCLL), to distinguish it from the New Jersey Use Car Lemon Law, N.J.S.A. 56:8-67, et seq.

328. During the lemon period, defendant and/or the servicing dealer had multiple opportunities to fix the problems but failed to do so in a reasonable time.

329. The problems are not the result of abuse, neglect, or unauthorized modifications or alterations of the vehicle by anyone other than defendant or its dealer or distributor.

330. Plaintiff views the problems as substantially impairing the use, safety and/or value of the vehicle to plaintiff.

331. The vehicle's repair history cannot be erased but rather, is a permanent blemish on the vehicle's value.

332. Plaintiff's confidence in the vehicle is totally shaken.

333. To date, defendant never accepted return of the vehicle

from plaintiff and never issued plaintiff with a full refund of the purchase price of the vehicle, including any stated credit or allowance for the consumer's used motor vehicle, the cost of any options or other modifications arranged, installed, or made by the manufacturer or its dealer within 30 days after the date of original delivery, and any other charges or fees including, but not limited to, sales tax, license and registration fees, finance charges, reimbursement for towing and reimbursement for actual expenses incurred by the consumer for the rental of a motor vehicle equivalent to the consumer's motor vehicle and limited to the period during which the consumer's motor vehicle was out of service due to the nonconformity, less a reasonable allowance for vehicle use (the refund).

334. As a proximate result of the failure of defendant to honor the NCLL by providing the refund to plaintiff, plaintiff suffered damages.

335. Accordingly, plaintiff seeks the refund and an award of reasonable attorney's fees, fees for expert witnesses and costs.

336. Plaintiff's counsel complied with N.J.S.A. 56:8-20.

**COUNT 5**

**SECTION 2 CFA VIOLATIONS**

**PLED BY PLAINTIFFS ONLY (AND NOT THE CLASS) AGAINST DEFENDANTS**

337. The allegations contained in the previous paragraphs are repeated as if fully set forth herein.

338. This count is pled by plaintiffs only (and not the class) against defendants.

339. The CFA is a statute that is to be applied broadly given the statute's remedial purpose.[53]

340. Under the CFA, "(d) The term "person" as used in this act shall include any natural person or his legal representative, partnership, corporation, company, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestuis que trustent thereof;" N.J.S.A. 56:8-1(d).

341. The parties meet the definition of "person" as set forth in N.J.S.A. 56:8-1(d).

342. Under the CFA, "[t]he term "advertisement" shall include the attempt directly or indirectly by publication, dissemination, solicitation, indorsement or circulation or

---

[53] *Lemelledo v. Beneficial Management Corp. of Am.*, 150 N.J. 255, 264 (1997); *Blatterfein v. Larken Associates*, 323 N.J. Super. 167, 178 (App. Div. 1999).

in any other way to induce directly or indirectly any person to enter or not enter into any obligation or acquire any title or interest in any merchandise or to increase the consumption thereof or to make any loan;…." N.J.S.A. 56:8-1(a).

343. Under the CFA, "[t]he term "merchandise" shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale;…." N.J.S.A. 56:8-1(c).

344. The vehicle is merchandise subject to the CFA.

345. Under the CFA, the term "sale" shall include any sale, rental or distribution, offer for sale, rental or distribution or attempt directly or indirectly to sell, rent or distribute. N.J.S.A. 56:8-1(e).

346. The sale of the vehicle constitutes a "sale" under the CFA.

347. Further, N.J.S.A. 56:8-2 states, in pertinent part: "The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with

the subsequent performance of such person as aforesaid,
whether or not any person has in fact been misled, deceived
or damaged thereby, is declared to be an unlawful
practice…." N.J.S.A. 56:8-2.

348. The CFA is designed to protect the public even when a
merchant acts in good faith.[54]

349. As to any individual defendants facing CFA violations pled
in this pleading, under the CFA, there is no need to pierce
any corporate or company veil; the Court instead focuses on
individual defendants' misconduct supporting CFA
violations.

350. Therefore, assuming for argument's sake that the
individual defendants named to this case operated via one
or more valid corporations or companies, the corporate veil
does not insulate corporate officers or employees or
company managing members or employees from CFA liability.[55]

351. Defendants' course of conduct in this dispute provides
evidence of a section 2 knowing omission violation of
N.J.S.A. 56:8-2 (section 2) via unlawful practices, both in
the initial transaction and in subsequent performance.

352. Relative to the vehicle's problems, which were known to
defendants before plaintiffs purchased the vehicle and

---

[54] *Cox v. Sears*, 138 N.J. 2, 16 (1994).
[55] *Allen v. V & A Bros.*, 208 N.J. 114 (2011).

which defendants failed to disclose to plaintiffs, defendants committed a knowing omission involving the following: (1) nondisclosure—"a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed—"the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge—defendants "knew the fact and its importance at the time of the transaction"; and (4) intentional concealment—defendants withheld the information intending for the buyer to make a decision without knowing the fact.

353. Defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.[56]

354. Vehicle purchasers such as plaintiffs have viable knowing omission claims where, as here, a manufacturer designs and distributes a vehicle with a problem not readily discoverable by customers but of which the manufacturer was aware yet failed to disclose to those customers.[57]

---

[56.] New Jersey Model Civil Jury Charge 4:43.

[57.] *Robinson v. Kia Motors Am., Inc.*, No. 13-006, 2015 U.S. Dist. LEXIS 121755 (D.N.J. Sept. 11, 2015). The court explained: In addition to the allegations of knowledge described above, Plaintiffs further assert that Kia was aware of the defect based on (1) online customer complaints about the alleged problem, and

355. Unlike the usual vehicle put into the steam of commerce with a warranty, the manufacturer was not in good faith insuring against a risk but actually knew *with certainty* that the product at issue or one of its components was going to fail.[58]

356. Plaintiffs need not prove their case on the pleadings but rather, must merely allege details showing that it is *plausible* that defendants knew of the problems before the sale and yet failed to disclose same to plaintiffs.[59]

357. There is evidence of defendants' foreknowledge of failure because defendants knew the problems plagued successive model years of Pilots (as evidenced by comments on the

---

(2) a technical service bulletin ("TSB") issued by Defendants . . . . Specifically, Plaintiffs direct the Court to specific websites that they allege contain complaints about the crankshaft pulley bolt problem. (*Id.*). They include detailed information regarding the names of the websites and the number and nature of the complaints. (*Id.*). In addition, Plaintiffs allege that a TSB issued in June 2007 that "identified the problem discussed in this complaint stating: '[t]he Crankshaft Pulley bolt may become loose, especially if improperly torqued during routine service . . . .'" At least one New Jersey Plaintiff, Robinson, purchased her vehicle after the June 2007 TSB was issued . . . . Its "publication adds further plausibility to [plaintiffs'] allegations that [d]efendants had knowledge of . . . the alleged defect."

[58]. *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2017 U.S. Dist. LEXIS 123546 (D.N.J. Aug. 4, 2017).

[59] *Leon v. Rite Aid Corp.*, 340 N.J. Super. 462, 472 (App. Div. 2001).   See also *Printing Mart v. Sharp Elecs.Corp.*, 116 N.J. 739, 746 (1989)("…in determining whether dismissal under Rule 4:6-2(e) is warranted, the court should not concern itself with the plaintiffs' ability to prove its allegations.").

aforesaid vehicle owner forum indicating the repeated reporting of failures for identical or near identical or related reasons) and yet failed to correct the problems for subsequent model year lines.[60]

358. In addition to the aforesaid misconduct referenced above, during the course of the transaction or during subsequent performance of obligations, defendants may have committed other types of CFA violations, such as failure to make other mandatory disclosures or the like – misconduct which may be uncovered during the course of discovery.

359. To the extent that substantial aggravating circumstances are necessary for any of the aforesaid CFA violations, all the aforesaid misconduct amounted to substantial aggravating circumstances over and above a mere breach of

---

[60]. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-04209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. Mar. 11, 2015). The court explained: Plaintiff buttresses this allegation with a research report from CK Commercial Vehicles, published before Plaintiff purchased any of its tractors, which indicates that 37% of a group of users of tractors with Cummins engines experienced "a high rate of cracked DPF filters . . . ." [T]he amended complaint also alleges that Defendants learned about these defects through "[t]he on-board diagnostics systems . . . that store trouble or fault codes and provide data to Defendants' and/or their authorized service providers' diagnostic computers." On a motion for class certification of the CFA claims, the district court held that the plaintiffs' CFA claims sufficed. As to ascertainable loss, one plaintiff incurred over $80,000 in post-warranty repair costs. *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).

contract and/or breach of warranty and therefore, said

misconduct was sufficient to trigger one or more CFA

violations.

360. Substantial aggravating circumstances may include,

'existence of bad faith or lack of fair dealing.'"[61]

361. Substantial aggravating circumstances are present in this

case because defendants, possessing knowledge of the

vehicle's predelivery problems, acted in bad faith and

failed to deal fairly with plaintiffs because defendants:

(1) put into the stream of commerce and continued to offer

the vehicle for sale to consumers such as plaintiffs while

failing to disclose the vehicle's problems; (2) was aware

that the problems would manifest themselves within the

warranty period and that the vehicle would fail yet failed

to disclose that information to plaintiffs; and (3)

provided repeated repairs that defendants knew would not

fix the vehicle or fix the vehicle in a reasonable period

of time while failing to disclose such fact to plaintiffs

and while failing to simply provide plaintiffs with a UCC

revocation of acceptance remedy or NCLL statutory

---

[61]. *JWQ Cabinetry Inc. v. Granada Wood & Cabinets Inc.*, No. 13-4110 (FLW), 2015 U.S. Dist. LEXIS 31730 (D.N.J. Mar. 16, 2015) (citing *Petri Paint Co., Inc. v. OMG Ams., Inc.*, 595 F. Supp. 2d 416, 420 (D.N.J. 2008)) (citing, in turn, *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 18 (1994)).

repurchase remedy.[62]

362. When purchasing the vehicle, plagued as it is by the problems of which the manufacturer was aware of presale, plaintiffs failed to receive the benefit of plaintiffs' bargain.  The vehicle's value is substantially impaired by the predelivery problems of which plaintiffs only became aware after taking delivery of the vehicle.

363. Plaintiffs had the vehicle examined by a mechanic expert and that expert determined that the vehicle suffered a diminution in value and that the defect affects the vehicle's use, value and safety.  Exhibit H.

364. That diminution in the vehicle's value due to its repair history establishes the basis for an ascertainable loss of money or property proximately caused by the CFA violations detailed above that is able to be ascertained within a reasonable degree of certainty.[63]

---

[62] See, e.g., *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 443 (D.N.J. 2012) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111-12 (App. Div. 2006); *Maniscalco v. Brother Int'l Corp. (USA)*, 627 F. Supp. 2d 494, 501 (D.N.J. 2009); *Kuzian v. Electrolux Home Prods., Inc.*, No. 12-3341 (NLH/AMD), 2013 U.S. Dist. LEXIS 44050, at *29-30 (D.N.J. Mar. 27, 2013)(A putative class of plaintiffs alleged that defective ice makers failed to produce ice, leaked water into the refrigerators causing the electrical components to short out and malfunction, thereby caused the refrigerators to warm to unsafe temperatures and that the defective ice makers and resulting leaks caused food to spoil and caused damage to flooring, walls and other personal property beyond the refrigerator itself.).
[63]. *Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist.

365. The potential for future repair costs to attempt to fix the problems once the warranty is over is evidence of an out of pocket ascertainable loss of money that is able to be ascertained within a reasonable degree of certainty.[64] Where, as here, someone faces or expects to incur an out of pocket loss, such a loss equates with an ascertainable loss sufficient to support liability under the CFA.[65]

366. Had plaintiffs received disclosure of the problems before purchasing the vehicle, plaintiffs would have never paid out of pocket for the vehicle and that purchase price – paid for a vehicle with problems that can't be fixed in a reasonable time or perhaps ever under the warranty - establishes an out of pocket ascertainable loss of money

---

LEXIS 166329 (D.N.J. Dec. 1, 2016). The court explained: Here, Plaintiffs have alleged injuries that have already occurred, as well as imminent future injury. Specifically, all Named Plaintiffs have alleged economic injury in the form of diminished resale value of their vehicles. In addition, Plaintiffs spent time taking their vehicles to BMW repair centers. Several Plaintiffs have also incurred out-of-pocket costs to purchase extra oil and replacement batteries. Accordingly, they have satisfied Article III's injury in fact requirement.
*Bang v. BMW of N. Am., LLC*, No. 15-6945, 2016 U.S. Dist. LEXIS 166329 (D.N.J. Dec. 1, 2016).
[64] *T.J. McDermott Transp. Co. v. Cummins, Inc.*, No. 14-4209 (WHW) (CLW), 2015 U.S. Dist. LEXIS 29678 (D.N.J. June 7, 2016).(one plaintiff incurred over $80,000 in post-warranty repair costs.).
[65] See *Cox v. Sears Roebuck & Co.*, 138 N.J. 2 (1994); *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).  Under the CFA one does not need to actually incur the loss to sufficiently allege same in a pleading.  See *Thiedemann v. Mercedes-Benz USA*, 183 N.J. 234 (2005).

that is able to be ascertained within a reasonable degree of certainty.[66]

367. Because plaintiffs suffered an ascertainable loss as aforesaid, treble damages are available for the CFA aforesaid CFA violations.[67]

368. Equitable relief is available in the form of a full refund and a judgment or order declaring the aforesaid misconduct as illegal.[68]

369. In addition, a statutory refund is sought – that is, relief pursuant to the CFA's refund provision, which states: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein to be unlawful.[69]  The refund of moneys herein provided for may be recovered in a private action or by such persons authorized to initiate actions pursuant to P.L.1975, c. 376 (C. 40:23-6.47 et

---

[66]. *BK Trucking Co. v. PACCAR, Inc.*, No. 15-2282 (JBS/AMD), 2016 U.S. Dist. LEXIS 85149 (D.N.J June 30, 2016)(Vehicle buyers claimed vehicles equipped with emission treatment system are defective and render plaintiffs' vehicles inoperable due to the engines' constant failure despite repeated warranty repair and the precise details of those systems are in the exclusive control of defendants. Plaintiffs have further alleged that, if defendants had disclosed to them the nature of the ATS and its impact on the engine, they would not have bought vehicles equipped with the engine or would not have paid over $100,000 for them).
[67] N.J.S.A. 56:8-19.
[68] N.J.S.A. 56:8-19.
[69] N.J.S.A. 56:8-2.11.

seq.).[70]"   The New Jersey Supreme Court explained the separate cause of action available for refunds as follows: "The CFA vests the Attorney General with jurisdiction to enforce its provisions through a variety of mechanisms, N.J.S.A. 56:8-3 to -8, -11, -15 to -18, & -20, but it also provides individual consumers with a cause of action to recover refunds, N.J.S.A. 56:8-2.11 to -2.12, and treble damages for violations, whether in good faith or otherwise, N.J.S.A. 56:8-19."[71]

370. Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.[72]

371. One or more statutes pled herein provide for fee shifting for parties hiring counsel and prevailing under said statutes.

372. Accordingly, the counsel bringing this case serves as a private attorney general.[73]

373. Otherwise, consumers pursuing claims under fee shifting states might incur potentially considerable expense for a

---

[70] N.J.S.A. 56:8-2.12.  The last reference in this provision to "P.L.1975, c. 376 (C. 40:23-6.47 et seq.)" refers to actions by the offices of the Department of Consumer Affairs.
[71] *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255 (1997).
[72]. *Artistic Lawn & Landscape Co., Inc. v. Smith*, 381 N.J. Super. 75, 89 (Law Div. 2005) (citing *BJM Insulation & Constr., Inc. v. Evans*, 287 N.J. Super. 513 (App. Div. 1996)).
[73] See *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 150 N.J. 255, 268 (1997).

potentially small recovery.[74]

374. Given defendants' omission about the problems and the predelivery repairs, defendants engaged in knowing omission affirmative act section 2 CFA violations via unlawful practices, both in the initial transaction and in subsequent performance thereof.

375. By failing to alert or disclose presale to plaintiffs the existence of the problems of which defendants had knowledge, defendants engaged in an "omission" - the act of neglecting to do what the law requires and liability is imposed for such inaction because of the existence of a duty to act under the circumstances.

376. Therefore, the following occurred in this case: (1) nondisclosure by the manufacturer — "a fact existing at the time of the transaction was not disclosed"; (2) materiality of fact undisclosed by the manufacturer — "the fact, if disclosed, would be important to the plaintiffs' decision to purchase or to the decision of any reasonable buyer"; (3) knowledge on the part of the manufacturer — the merchant "knew the fact and its importance at the time of

---

[74] See e.g., *Skeer v. EMK Motors, Inc.*, 187 N.J. Super. 465, 470 (App. Div. 1982)(discussing fee shifting under the CFA); *Chattin v. Cape May Greene, Inc.*, 243 N.J. Super. 590, 610 (App. Div. 1990), aff'd o.b., 124 N.J. 520 (1992) (citing *Coleman v. Fiore Bros.*, Inc., 113 N.J. 594, 598 (1989))(same); *Furst v. Einstein Moomjy*, 182 N.J. 1, 21 (2004)(same).

the transaction"; and (4) intentional concealment by the manufacturer — the merchants withheld the information intending for the buyer to make a decision without knowing the fact.

377. In addition to the aforesaid misconduct referenced above, during the course of the transaction or during subsequent performance of obligations, defendants may have committed other types of CFA violations, such as failure to make other mandatory disclosures or the like – misconduct which may be uncovered during the course of discovery.

378. To the extent that substantial aggravating circumstances are necessary for any of the aforesaid CFA violations, all of the aforesaid misconduct amounted to substantial aggravating circumstances over and above a mere breach of contract and/or breach of warranty and therefore, said misconduct was sufficient to trigger one or more CFA violations.

379. This is because defendants' entire course of conduct indicates a lack of good faith and fair dealing towards plaintiffs and a predatory approach instead of one that was honest and forthright.

380. Substantial aggravating circumstances are present in this case because defendants, possessing knowledge of the vehicle's predelivery problems, acted in bad faith and

failed to deal fairly with plaintiffs because defendants: (1) put into the stream of commerce and continued to offer the vehicle for sale to consumers such as plaintiffs while failing to disclose the vehicle's problems; (2) were aware that the problems would manifest themselves within the warranty period and that the vehicle would fail yet failed to disclose that information to plaintiffs; (3) via the dealers, provided repeated repairs that defendants knew would not fix the vehicle or fix the vehicle in a reasonable period of time while failing to disclose such fact to plaintiffs and while failing to simply provide plaintiffs with relief under the UCC or the NCLL statutory repurchase remedy; (4) via the dealers, provided repeated repairs to the vehicle for the problems but after facing suit, belatedly claimed that the problems aren't covered under the warranty; and (5) via the dealers, provided plaintiffs with the warranty but now claim that there is no relief available when repair attempts under the warranty fail to serve to fix the vehicle in a reasonable time – thereby acting as if the warranty is a meaningless and gratuitous promise.

381. As a proximate result of the section 2 CFA violations detailed above, plaintiffs incurred out of pocket ascertainable losses of money detailed above.

382. For example, a merchant's sticker price for a product or service can provide evidence of loss – even if that price is greater than fair market value.

383. Therefore, the dealers' sales price for the vehicle provides a measure of loss.

384. Where, as here, someone faces or expects to incur or actually incurs an out of pocket loss, such a loss equates with an ascertainable loss sufficient to support liability under the CFA.

385. In addition, plaintiffs failed to receive the benefit of the bargain – the vehicle at the promised price and free from the undisclosed problems. The vehicle's value is diminished as stated by the expert report submitted herewith.

386. Therefore, the vehicle is worth less than its purchase price and plaintiffs didn't get the vehicle in the condition promised and therefore, has a claim of ascertainable loss of money or property associated therewith.

387. Treble damages are available for the foresaid misconduct.

388. Equitable relief is available in the form of a full refund and a judgment or order declaring the aforesaid misconduct as illegal.

389. In addition, a statutory refund is sought pursuant to the

CFA's refund provision.

390. Pursuant to the CFA, an award of counsel fees and litigation costs is also sought.

**COUNT 6**

**CLAIMS AGAINST THE DOES ONLY**

391. The allegations contained in the previous paragraphs are
     repeated as if fully set forth.

392. This count is pled against the Does.

393. All allegations pled in the above counts are pled against
     the Does and all relief sought in said counts is sought
     against the Does.

**PRAYER FOR RELIEF COMMON TO ALL COUNTS**

**WHEREFORE**, judgment is demanded for: (1) all applicable damages – including any specific types of damages specifically pled in any of the above listed counts; (2) the remedies provided for under the common law and/or any state and/or federal statutes pled herein or applicable to this case including any mandated counsel fees and/or costs/expenses and any applicable equitable relief; and (3) such other and further relief as the court shall deem equitable and just.

**JURY DEMAND**

Relative to all issues pled in the instant action that so triable, a trial by jury is demanded.

**DESIGNATION OF TRIAL COUNSEL**

**LEWIS G. ADLER, ESQ.** is designated as trial counsel in this matter for the parties submitting this pleading for filing.

**CERTIFICATION OF VERACITY OF PLEADING**

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law licensed to practice law in the State of New Jersey.

2. I am co-counsel for plaintiffs.

3. I make the statements contained in this certification from personal knowledge.

4. The basis of my personal knowledge is my personal work on this file.

5. I make this certification in support of this pleading.

6. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have  evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable    opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. §1746

I certify, under penalty of perjury that the foregoing is true

and correct.

Respectfully submitted,

EXECUTED ON:  May 19, 2022

/s/Lewis G. Adler
LEWIS G. ADLER
26 Newton Ave.
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504
Co-counsel for plaintiff(s)
Email:  lewisadler@verizon.net

## LOCAL RULE 11.2 CERTIFICATION

LEWIS G. ADLER hereby certifies to the Court as follows:

1. I am an attorney at law licensed to practice law in the State of New Jersey.

2. I am counsel for the party/parties filing this document.

3. I make the statements contained in this certification from personal knowledge.

4. The basis of my personal knowledge is my personal work on this file.

5. I make this certification in support of this pleading.

6. The matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding, and, if so, the certification or other authorized document shall identify each such action, arbitration or administrative proceeding, and all parties thereto.

CERTIFICATION MADE PURSUANT TO 28 U.S.C. §1746

I certify, under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

EXECUTED ON:  January 14, 2022

/s/Lewis G. Adler

LEWIS G. ADLER
26 Newton Ave.,
Woodbury, NJ 08096
Tel. #: (856) 845-1968
Fax #: (856) 848-9504

Co-counsel for plaintiff(s)
Email:  lewisadler@verizon.net